**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **DR. ANDREW K. FOX,** | |
| Plaintiff, | |
| | Case No.    1:22-cv-00835 |
| v. | |
| | **COMPLAINT** |
| **CITY OF AUSTIN and JOEL G. BAKER,** **in his individual capacity,** | |
| | **Jury Trial Demanded** |
| Defendants. | |

**Introduction**

Dr. Andrew K. Fox ("Dr. Fox") is an ordained minister who helped start Austin's fire chaplaincy program and served as its lead chaplain—a volunteer position—for eight years. That abruptly changed when Dr. Fox posted something on his personal blog that Austin officials considered unacceptable: his religious belief that men and women are created biologically distinct and his view that men should not compete on women's sports teams. After Austin officials demanded that Dr. Fox recant and apologize for expressing these beliefs and Dr. Fox refused, they terminated him. An eight-year career spent faithfully serving the spiritual needs of Austin's firefighters meant little when it ran into the City's censorious social-justice agenda and need for ideological uniformity.

That agenda propelled Defendants to disregard Dr. Fox's actual track record of integrity and excellence. For eight years, Dr. Fox walked side-by-side with first responders and their families, providing a listening ear and source of prayer, as they encountered deaths, suicides, and other tragedies. For eight years, Dr. Fox provided all firefighters with consistent care and equal treatment no matter who

they were, including those in the LGBT community. For eight years, Dr. Fox treated everyone he encountered with dignity and respect as he ministered to others in accordance with his religious beliefs and fire department policy. And he did this all voluntarily—without pay—out of love for the men and woman who sacrificially serve their community. No one ever accused him of discriminating against anyone or treating anyone improperly. To the contrary, the City lauded him for his integrity and service. Separate from his work as a chaplain, Dr. Fox consistently shared his religious and philosophical reflections online for years without any problem. It was only when Dr. Fox expressed a particular set of views that officials disliked that the City extinguished Dr. Fox's career.

Defendants acted unjustly and unconstitutionally. Under the City's standard, no one who openly holds historic Christian beliefs about the immutable differences between men and women can serve as a chaplain or in any other fire department position. And that should concern everyone no matter their views. When the government can needlessly punish people for professing views outside of work on matters of ongoing public debate, that chills everyone's speech and discourages democratic participation. Americans cannot learn to respect each other's differences when they face career-crushing consequences anytime their personal beliefs, expressed openly on their own time outside of work, contradict the ideological commitments of some HR officials. Defendants should tolerate and encourage City personnel to express diverse viewpoints outside of work, not try to cancel them when they do.

To remedy these unconstitutional actions and to protect the rights of Austin personnel to hold and profess different views, Dr. Fox brings this suit because Defendants retaliated against him for exercising his First Amendment rights, violated his First Amendment right to free speech and free exercise of religion, and violated the Texas Constitution.

## Jurisdiction and Venue

1.      This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 and state-law claims under Article 1, Sections 6 and 8 of the Texas Constitution.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331, 1343 and supplemental jurisdiction under § 1367(a).

3.      This Court has the authority to award relief under 28 U.S.C. §§ 2201 and 1343 and 42 U.S.C. § 1988.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because this claim arose in Austin, Texas, and upon information and belief, all Defendants reside within this District.

## Plaintiff

5.      Dr. Andrew K. Fox is a United States citizen and resides in Williamson County, Texas.

6.      Dr. Fox served in a volunteer capacity as Lead Chaplain of the Austin Fire Department ("AFD" or the "Fire Department" or the "Department") from 2013 until his dismissal on December 9, 2021.

7.      All of the key events of Dr. Fox's chaplaincy and dismissal took place within this District.

## Defendants

8.      The City of Austin, Texas is a municipality endowed under Texas law with the power to sue and be sued. Tex. Const. art. XI, § 5 (cities of 5,000 or more population; adoption or amendment of charters); Tex. Loc. Gov't Code § 51.072 (authority of local self-government); *id.* § 51.001 (ordinance, rule, or regulation necessary to carry out other powers); Austin, Tex., Code of Ordinances, Charter art. I, § 3 (incorporation, form of government, powers – general powers). The City

can be served with process through its City Clerk, Myrna Rios, at 301 West 2nd Street, Suite 2030, Austin, Texas 78701, or wherever she may be found.

9.     Joel G. Baker ("Chief Baker") is, and was at all times relevant to the claims in this complaint, the Fire Chief of the Department.

10.     Chief Baker is sued in his individual capacity. He can be served with process at his office of 4201 Ed Bluestein Boulevard, Austin, Texas 75725, or wherever he may be found.

## Factual Background

### Dr. Fox's faith into action

11.     Andrew K. Fox was born, adopted, and raised in the United Kingdom.

12.     As a young man, he experienced a call to Christian ministry.

13.     Answering that call, in 1995, he was ordained as a minister in the Assemblies of God in Great Britain, and he worked in fulltime ministry in the United Kingdom for several years.

14.     In 1999, Dr. Fox immigrated to the United States with his wife, feeling called to ministry in the United States.

15.     In 2000, Dr. Fox transferred his ordination to the Assemblies of God in the United States.

16.     When he first moved to the United States, Dr. Fox's ministry included pastoring a church in Washington State.

17.     In his community and church in Washington, Dr. Fox was surrounded by many law enforcement members, and he became involved with the Kennewick Police Department. At first, his involvement was informal. For example, he would be asked to pray with some people at the department.

18.     In 2004, Dr. Fox became an official volunteer chaplain for the police department. He continued serving as chaplain until 2009, shortly before he and his family moved out of Washington.

19.    While serving as the chaplain for the Kennewick Police Department, Dr. Fox graduated from the Police and Fire Chaplain Training Academy and completed Crisis Intervention Training with the Kennewick Police Department and the Benton-Franklin Community Health Alliance.

20.    From 2010 to 2011, Dr. Fox and his family lived in Wichita, Kansas, where Dr. Fox had taken a position as an interim pastor at a church.

21.    Then, in 2012, Dr. Fox and his family moved to Austin, Texas.

22.    While in Texas, Dr. Fox earned his Ph.D. in Intercultural Studies from Assemblies of God Theological Seminary in Springfield, Missouri in 2017.

23.    Dr. Fox is involved in several businesses and nonprofit organizations.

24.    To Dr. Fox, the primary purpose of his business endeavors is to support his ministry and serve the community.

25.    These endeavors include a real estate business and a consulting practice from which he consults with businesses, particularly churches and nonprofits, to help them build a cohesive and clear culture.

26.    Dr. Fox is also President of Dr Andrew K Fox Inc., a nonprofit 501(c)(3) corporation that manages various aspects of Dr. Fox's ministry.

27.    The nonprofit publishes the books that Dr. Fox has authored. It also maintains a website, DrAndrewFox.com, which includes a blog (the "blog"), information on Dr. Fox's premarital counseling and wedding officiating ministry, and information on Dr. Fox's lectures at churches and universities throughout the United States and abroad.

28.    The blog is not associated with the Fire Department in any way; rather, it introduces Dr. Fox as simply a "speaker," "author," and "teacher."

29.    The blog is geared toward readers in academic and ecclesial circles.

30.    The blog is not monetized, but it has led to paid writing and speaking opportunities for Dr. Fox.

31.    Dr. Fox does not follow a set writing schedule for his blog; he writes as he has time and when he has something to say.

32.    When a new blog post is published, it goes out to the blog's subscribers (just under 1000 of them), and Dr. Fox shares it on his social media.

33.    Dr. Fox has never intentionally promoted his blog to any AFD members, nor has he intentionally promoted his blog while carrying out his chaplain duties.

34.    The Fire Department did not have a say in the running of any of Dr. Fox's businesses or nonprofit organizations or the messages that Dr. Fox communicated in his teaching, writing, or wedding officiating.

<u>Dr. Fox's religious beliefs</u>

35.    Dr. Fox is a protestant Christian who holds to historic Christian beliefs.

36.    Since 1995, Dr. Fox has been an ordained minister in the Assemblies of God.

37.    The Assemblies of God promotes chaplaincy ministry and teaches that the work of a chaplain is "pastoral, offering compassion and a listening ear, but also affirming and encouraging, bringing an informed Christian view to the places that [they] visit and people [they] meet."[1]

38.    Dr. Fox shares the conviction that chaplains serve the community by being a spiritual resource for public servants.

39.    Dr. Fox believes that he was called to serve the AFD members by helping organize the chaplain program and by freely offering counsel, advice, or prayer to Department members in need.

---

[1] *Chaplaincy*, Assemblies of God, https://www.aoggb.com/chaplaincy (last visited Aug. 4, 2022).

40.     Dr. Fox believes that everything he does is for God's glory, and his array of businesses and nonprofits are also part of his ministry and spiritual calling.

41.     Dr. Fox believes that every human being is made in the image of God.

42.     Dr. Fox believes that his faith requires treating others as fellow image-bearers worthy of equal respect and dignity.

43.     Beginning in February 2021, Dr. Fox organized and held monthly Zoom meetings with various clergy, academics, church leaders, and higher education students to discuss how the Church can include the LGBT community in the Great Commission.

44.     Dr. Fox's goal was to write a collaborative book on the inclusion of the LGBT community in the biblical Great Commission.

45.     Like many orthodox Christians, Dr. Fox believes that God created two sexes—male and female—and that sex is immutable.

46.     Dr. Fox believes that all truth is ultimately from God.

<u>Dr. Fox's chaplaincy at the Fire Department</u>

47.     In 2012, the Austin Fire Department had no chaplain or chaplains' program—volunteer or otherwise.

48.     Dr. Fox, who was preparing to move to Austin, had left an excellent impression on Chief Ken Hohenberg of the Kennewick Police Department.

49.     So in 2013, Chief Hohenberg contacted Austin's Chief of Police, Art Acevedo, recommending Dr. Fox as a chaplain.

50.     At the time, though, the Austin Police Department already had a volunteer chaplain program and did not need additional chaplains.

51.     Police Chief Acevedo knew that there was no chaplain program at the Fire Department, so he connected Dr. Fox with then-Austin Fire Chief Rhoda Mae Kerr.

52.     Dr. Fox met with Chief Kerr to discuss starting a volunteer chaplain program.

53.     Dr. Fox also went through the stringent application and interview process, including a background check, to become a volunteer with the Fire Department.

54.     After completing the process, Dr. Fox signed an agreement and became volunteer Lead Chaplain for the Department starting in 2013.

55.     Dr. Fox helped launch the Austin Fire Department Volunteer Chaplains' Program and was involved with the program from the start.

56.     Dr. Fox met with the Department's then-Chief of Staff Tom Dodds about the Chaplains' Program to discuss everything from the chaplains' uniforms to the titles the chaplains would have.

57.     They landed on "Lead Chaplain" for Dr. Fox's title.

58.     The Chaplains' Program is run in partnership with the Federation of Fire Chaplains (the "Federation").

59.     The Federation notes that firefighters have the world's most dangerous profession.[2]

60.     Around the same time that he became Lead Chaplain, Dr. Fox joined the Federation of Fire Chaplains. As a Federation member, Dr. Fox received the stock fire chaplain manual. Dr. Fox adapted the manual to become the first manual for the AFD Chaplains' Program.

61.     Chief Kerr approved the first Chaplain Manual in 2014.

62.     Dr. Fox also helped recruit three other chaplains of different faith backgrounds to join the program, two of whom remain to this day.

_____

[2] Ed Stauffer, *Our History*, Federation of Fire Chaplains, https://ffc.wildapricot.org/page-1442207 (last visited Aug. 4, 2022).

63.     The first group of Austin fire chaplains were trained in the spring of

2014.

64.     The Austin fire chaplains serve in a variety of ways. According to

Austin Public Safety Wellness,

> Fire Chaplains provide faith based aid, comfort, counsel and help to our members of the Fire Department, both civilian and sworn, and their families.
>
> Fire Chaplains are members of the clergy from all faith traditions who are respectful of and committed to harmonious and cooperative co-existence with other religious beliefs without being required to compromise their own beliefs or convictions.
>
> Fire Chaplains exhibit their faith through service and not by proselytizing or attempting to force beliefs onto those being served. Instead, Fire Chaplains provide a safe, welcoming and comforting presence to our members and their families.
>
> Fire Chaplains help our members and their families when they are facing some type of tragedy or difficulty in their lives. Fire Chaplains assist them in identifying and drawing upon a core of support (co-workers, family, friends, clergy, and social services) in order to carry them through the days and months following the immediate crisis. Clergy often refer to this type of activity as "pastoral care" or "compassionate ministry."
>
> Fire Chaplains visit the sick, serve as counselors, practice and exhibit ethical behavior.
>
> Fire Chaplains are counselors who may be approached in confidence and must hold information provided to them in confidence. The only exceptions involve information related to the abuse of children or the elderly and when information is disclosed that suggests intent to immediately harm self or others.
>
> All Fire Chaplains are called upon to be flexible, to have a good sense of humor and to extend compassion and understanding to those under the influence of their ministry.[3]

65.     Fire Department chaplains are required to volunteer a minimum of 40

hours every quarter, participate in one ride-out at a fire station each month, and

attend a monthly in-service chaplain meeting.

---

[3] *Chaplaincy at AFD*, Austin Public Safety Wellness, https://www.atxpublicsafetywellness.com/behavioral/afdchaplain (last visited Aug. 4, 2022).

66.    The Fire Chief requires the chaplains to keep track of their volunteer hours on a monthly basis and submit a monthly report to the Lead Chaplain.

67.    A Fire Department chaplain is on call 24/7, year round.

68.    On-call chaplains are committed to responding to calls at any hour.

69.    Occasionally, a chaplain is asked to respond to a call even if not on call or on duty.

70.    Dr. Fox's duties as Lead Chaplain also included overseeing and coordinating all chaplain activities within Fire Department.

71.    Fire Department chaplains also give invocations and benedictions when relevant at Training Academy graduations; ceremonies for promotions, awards, and retirements; building dedications; or other appropriate events.

72.    When the City of Austin held its annual 9/11 memorial, either Dr. Fox or another chaplain would offer an invocation.

73.    Chaplains provide input to the Department on the needs, concerns, and interests of the faith community.

74.    Chaplains keep confidential the privileged information learned in counseling sessions, unless a person's life is in imminent danger or the chaplain learns information relating to child abuse.

75.    Chaplains must maintain high ethical standards and abide by relevant Fire Department General Orders.

76.    According to Austin Public Safety Wellness, "Fire Chaplains are available to counsel firefighters following critical incidents, such as fire fatalities. The on-call Chaplain will be available on the scene and in the days following the incident if a firefighter desires to talk with him/her."[4]

---

[4] *Id.*

77.    Fire Department chaplains are one of several resources that Department members can turn to when they are struggling.

78.    Firefighting is a hazardous and high-stress profession.

79.    The stress firefighters experience can negatively affect their physical, emotional, and spiritual well-being.

80.    In fact, more firefighters now die by suicide than in the line of duty.[5]

81.    One national survey from 2015 showed nearly half of the surveyed firefighters had experienced suicidal thoughts.[6]

82.    And a 2019 survey of first responders in Virginia revealed that first responders experience suicidal thoughts at a rate of more than double the general population.[7]

83.    During Dr. Fox's years at the Department, multiple Fire Department members died by suicide and other causes.

84.    But when tragedy struck, Dr. Fox was there.

85.    After the sudden death of a Fire Department member in 2017, Dr. Fox provided support to the deceased member's family and the Fire Department community.

86.    Then-Chief Kerr thanked Dr. Fox for his service:

We've always known we could depend on you in a time of crisis, but this situation really put that to the test. ... Your willingness to do whatever could be done to help has made these days a little easier to bear.

---

[5] Nicole F. Roberts, *More Firefighters Committed Suicide In 2017 Than Died In Line of Duty*, Forbes (Aug. 23, 2018, 9:43 AM), https://www.forbes.com/sites/nicolefisher/2018/08/23/haunted-heroes-more-firemen-committed-suicide-in-2017-than-died-in-line-of-duty/?sh=7d522f112a24.

[6] Ian Stanley et al., *Career prevalence and correlates of suicidal thoughts and behaviors among firefighters*, J. Affect. Disord. (2015), DOI: 10.1016/j.jad.2015.08.007.

[7] Justin Jouvenal, *New survey shows heavy psychological toll for Virginia's first responders*, Wash. Post (Sept. 10, 2019, 12:00 AM), https://www.washingtonpost.com/local/public-safety/new-survey-shows-heavy-psychological-toll-for-vas-first-responders/2019/09/09/636df99e-d323-11e9-9610-fb56c5522e1c_story.html.

Frankly, I'm not sure what we or the family would have done without your assistance.

87.    For his exemplary service, Dr. Fox received a pin, certificate, and commendation letter from Chief Kerr.

88.    And Dr. Fox served consistently year after year.

89.    For example, during and after the Austin ice storm in February 2021, the Fire Department was as busy as ever. Dr. Fox was called to the scene of a house fire.

90.    As firefighters pulled bodies out of a building, Dr. Fox kept the bodies covered so the press could not take pictures of the faces, and Dr. Fox debriefed with the crew, offering prayer to those who needed it.

91.    Later, AFD members reached out to him for support.

92.    At all times, Dr. Fox complied with the City of Austin's and the Fire Department's policies, including those relating to discrimination and harassment.

93.    In Dr. Fox's lengthy experience, gender identity rarely comes up in providing routine chaplaincy services; rather, those services tend to focus on a particular tragedy and helping the firefighter cope with what has happened in the line of duty.

94.    Throughout his career as a pastor and chaplain, Dr. Fox provided pastoral care to multiple people expressing an LGBT identity without incident or difficulty.

95.    Dr. Fox cares for the AFD members who identify as LGBT because they are image-bearers of God.

96.    Not once was Dr. Fox made aware of someone refusing his services or being dissatisfied with his pastoral care because of issues related to gender identity or any other protected characteristic.

97.    Dr. Fox was widely seen as a valuable member of the Fire Department.

98.    Dr. Fox was never disciplined for any impropriety or misconduct.

99.    Nor, prior to the blog posts at issue in this lawsuit, was he ever alerted that there were problems with anything he wrote or spoke as a private citizen, such as his sermons, lectures, and blog posts.

100.    Dr. Fox gave the invocation at Chief Baker's swearing-in ceremony on December 10, 2018.

101.    After the swearing-in ceremony, Dr. Fox had a conversation with Chief Baker.

102.    Chief Baker connected Dr. Fox with another chaplain in the Atlanta Fire Department, where Chief Baker formerly worked. Chief Baker told Dr. Fox to work with the Atlanta chaplain to get information for a proposal on the Chaplains' Program in Austin.

103.    Chief Baker specifically asked for a proposal that would make the Lead Chaplain position a paid position.

104.    After speaking with the Atlanta chaplain, Dr. Fox presented a proposal on expanding the Chaplains' Program and adding a paid position. Chief Baker and Dr. Ronnelle Paulson, another AFD representative, listened to the proposal in Chief Baker's office.

105.    In a follow-up meeting, Chief Baker informed Dr. Fox that there was no budget at the time for a paid fire chaplain position.

106.    Dr. Fox surmised that the City had rejected the proposal.

107.    In January 2021, the Austin public safety departments sought additional funding for psychiatric resources. At the same time, the Fire Department also requested funding for a new full-time civilian employee to provide coordination for Fire and EMS Behavioral Health resources.

108.    Assistant Chief Rob Vires, the Chief of Staff to Chief Baker, communicated to Dr. Fox that he would try to get the financial resources for the Department to add Dr. Fox to the payroll.

109.    Dr. Fox found deep personal and spiritual value and fulfillment in his role as chaplain. And his life has been greatly enriched by getting to know members of the Fire Department.

Retaliation for views expressed on Dr. Fox's personal blog

110.    Dr. Fox had been writing on various blogging sites for years without encountering any complaints.

111.    He began his blog on DrAndrewFox.com in 2019 and never discussed his writings at the Fire Department.

112.    On or about June 25, 2021, Dr. Fox began a series on his blog entitled "Willy Woke and the Chocolate Factory" (the "Willy Woke series"). The first post in the series was "A Room Full of Fog" (attached as **Exhibit A**).

113.    In this post, Dr. Fox discussed how a small number of "woke" people have had a disproportionate effect on culture and have led to devaluing truth.

114.    Then Dr. Fox pondered how Christianity might provide an alternative perspective, cherishing "logic and reason."

115.    On or about July 16, Dr. Fox published "Competitive Bosh!" (attached as **Exhibit B**).

116.    Dr. Fox began this post with a discussion of the ancient Olympics and women's sports.

117.    Dr. Fox wrote that, at the time of the blog post, "there [were] at least nine male athletes – that have transitioned to become female – bidding to compete in the 2021 Olympic and Paralympic Games."

118.    Dr. Fox also mentioned that several prominent female athletes spoke out against the International Olympic Committee's policy.

119.    Dr. Fox described that allowing males in women's sports contradicts teaching in several Bible verses, such as: "The Lord detests dishonest scales but accurate weights find favor with him." Proverbs 11:1 (NIV).

14

120.    And on or about August 6, Dr. Fox published "What's Inside the Trojan Horse?" (attached as **Exhibit C**).

121.    In that post, Dr. Fox explained equity versus equality and social justice versus biblical justice.

122.    He then shared the good news of the Gospel and how that differs from culture's view of social justice.

123.    On all of Dr. Fox's blog posts, he keeps a comment box open.

124.    Dr. Fox believes in civil discourse and is happy to hear the views of people who might disagree with him.

125.    An unknown number of individuals allegedly at the Fire Department anonymously complained about the blog posts.

126.    On August 6, Assistant Chief Vires emailed Dr. Fox and Chief Baker to set up a meeting.

127.    Vires told Dr. Fox over text message that the meeting would be about a blog post—specifically, the one about Olympic athletes.

128.    Vires said that "questions ha[d] arisen from a few different members of the" Department.

129.    Dr. Fox told Vires that he had no problem meeting, but he wanted to make sure that Chief Baker and Vires read the blog post in question before discussing it.

130.    Vires said that they both had read the post, and the meeting would provide context and help answer questions.

131.    The three met in the afternoon on Monday, August 30, 2021.

132.    Chief Baker and Vires said that they did not want to interfere with Dr. Fox's blogging or to censor him. But they said his blog post had offended some LGBT members of the Fire Department.

133.    Dr. Fox probed, asking what specifically had offended the anonymous individuals.

134.    Chief Baker and Vires did not know.

135.    Dr. Fox suggested that he meet with one of the LGBT liaisons for the Department to find out more.

136.    At the end of the meeting, Chief Baker asked Dr. Fox to close the meeting in prayer, as he often did when he and Dr. Fox met about Fire Department business. And Dr. Fox gladly complied.

137.    Chief Baker did not instruct Dr. Fox to take any specific action following that meeting.

138.    Afterward, per Dr. Fox's suggestion, Vires set up another meeting for Vires, Dr. Fox, and Fire Specialist Xochitl Chafino, who is and was one of the LGBT liaisons for the Department.

139.    Dr. Fox believed he should consider the criticisms that others had of him. After meeting with Chief Baker and Vires, Dr. Fox decided to make his blog posts temporarily private, until he could hear from the Fire Department's LGBT liaison.

140.    On September 15, Dr. Fox met with Vires and Chafino.

141.    Dr. Fox asked Chafino to show him what part of his blog posts offended her and other Fire Department colleagues.

142.    Chafino did not identify a problem with the blog posts. Instead, she mentioned other general concerns—for example, that many persons identifying as transgender experience bullying and mental health challenges—none of which were related to or directed against Dr. Fox.

143.    Chafino did not respond to Dr. Fox's opinion in his blog post about the fairness of males in women's sports.

144.    Still, Dr. Fox was grateful to speak face-to-face with Chafino, and he came away from the meeting open to further conversation.

145.    Dr. Fox wanted to engage further with the LGBT community to understand potential concerns, so he and Chafino set up another time to meet off the clock.

146.    On Friday, September 24, Dr. Fox met with Chafino for coffee to get her perspective as the LGBT liaison.

147.    Dr. Fox asked Chafino what she would like to share with him about the LGBT community. And Chafino opened up about her experiences.

148.    Dr. Fox's conversation with Chafino was cordial and kind.

149.    Dr. Fox was glad he got to know Chafino on a more personal level. And he was grateful for her openness, which gave him greater context for understanding the experiences of other Fire Department members, so that he could continue caring compassionately.

150.    But Chafino still did not explain what made Dr. Fox's blog posts offensive.

151.    So having heard out his critics, Dr. Fox decided to make his blog posts public once again.

152.    Dr. Fox kept Vires informed about his meeting with Chafino. And Dr. Fox continued to make himself available to those who wanted to discuss their concerns about the blog posts.

153.    On October 15, per Vires's invitation, Vires and Dr. Fox met for about 90 minutes at Dr. Fox's house to further discuss Dr. Fox's blog posts and the anonymous comments and responses to the blog.

154.    This was surprising, as Dr. Fox thought that the issue was resolved.

155.    At their meeting, Vires handed Dr. Fox some paper. Most of the pages were copies of Dr. Fox's blog posts. Some had highlights and handwritten comments

from anonymous commenters. None of the commenters identified themselves, so it was impossible to determine with certainty the number of commenters or whether they were actually affiliated with the Fire Department.

156.    Several comments accused Dr. Fox of male chauvinism, racism, and transphobia.

157.    One commenter wrote that Dr. Fox was "using his position as a trojan horse to push his own agenda and brand. … It's inexcusable to have Dr. Fox offered as a spiritual leader and allow him to push his ideologies onto unsuspecting folks seeking spiritual guidance."

158.    An apparently different commenter typed up an essay criticizing Dr. Fox's ideas about athletes who identify as transgender. The commenter also wrote that Dr. Fox's advocacy for women in sports was somehow condescending toward women.

159.    An additional commenter wrote an essay, criticizing Dr. Fox's statement about white privilege and tone regarding transgender ideology, citing statistics on transgender suicide rates.

160.    The essay concluded:

How can the Chaplain for a huge metro area fire department feel that it is appropriate to write such an online blog? How can a member of the department feel comfortable speaking to Dr. Fox about any issue if their family member is transgender? How can members of the public (who foot the bill for this entire department) read such perspectives and not come to the conclusion that if they are anything but 'white, male, cisgender, able bodied, native born, Christian' that they are not rejected and may not receive the same quality of care as someone who fits into those categories?

161.    Dr. Fox told Vires that these comments were nothing more than an attack on his character and track record, and Vires seemed supportive.

162.    Still, Vires told Dr. Fox that Chief Baker wanted him to write an official apology letter to the LGBT community at the Fire Department.

163.    On or before November 1, someone informed Vires about photos of Dr. Fox in his AFD uniform that were on Dr. Fox's page on Wedding Wire, a popular wedding vendor website. Vires emailed Dr. Fox asking him to remove the photos.

164.    The photos had been on Wedding Wire for about six years without issue.

165.    In fact, former Chief Kerr had instructed Dr. Fox to take every opportunity to promote the Fire Department.

166.    So Dr. Fox wore his uniform as he officiated many weddings.

167.    Many couples sought out his officiant services because they were firefighters or had a family member who had served, and the couples often wanted an officiant in uniform in honor of the familial connection.

168.    Dr. Fox also wore his uniform when he twice attended an out-of-state conference hosted by the Acton Institute in Michigan.

169.    This practice was not uncommon.

170.    Many Fire Department members have used their association with the Fire Department to promote their businesses without censure from the Department.

171.    For example, there are at least three moving companies in Austin, Texas that still today are marketed based on their connections with local fire departments, including the Austin Fire Department: ATX Firefighter Moving LLC, Firefighting's Finest Moving & Storage, Inc., and Accurate Moving LLC d/b/a/ Accurate Firefighter Movers LLC.

172.    On information and belief, Defendants instructed Dr. Fox to remove his Wedding Wire posting while allowing others to market services using their connection to the Fire Department because of its hostility to Dr. Fox's religious views and expression and in retaliation for his views and expression.

173.    Nevertheless, Dr. Fox removed the photos from Wedding Wire as asked.

174.    On November 23, Dr. Fox sent his draft response letter to Vires.

175.    In the draft, Dr. Fox attempted to explain his efforts to reach out to the LGBT community, his priority on serving everyone at the Fire Department regardless of any protected characteristics, and his intent in writing the blog post to promote discussion, not to cause offense.

176.    The first draft was rejected. According to Vires, Chief Baker wanted the letter to be shorter. And he wanted Dr. Fox to include an explicit apology for expressing his views and the harm allegedly caused by doing so.

177.    From speaking with Vires, it was clear to Dr. Fox that what Chief Baker required was something that explicitly recanted his beliefs.

178.    Dr. Fox explained that he could not recant his beliefs, but he would do his best to make it clear that his purpose in writing the blog post was not to cause offense and that he was sorry for any offense caused.

179.    Dr. Fox cut the letter down and included the following: "While I stand by the academic logic and reason in my blogs, at no point is it my intention to offend the reader. Rather, my intention is to open healthy discussion on any topic in a dialectic manner so we can learn more about each other through civil discourse – written or spoken. For those who are offended, I apologize if my blogs make you feel offended."

180.    Dr. Fox sent the edited version to Vires on December 1.

181.    Dr. Fox wrote in the letter that his life has been enriched through his service in the Fire Department. He also wrote that he is always mindful of how an AFD member identifies—in terms of religion, politics, gender, race, age, and more. But none of those identities changed the care Dr. Fox provided. He was always willing to provide counsel, advice, or prayer to anyone in the Department.

182.    Dr. Fox was willing to express regret that some people were offended. But he would not recant his beliefs because he could not with a clean conscience

pretend to have changed his opinion. Nor would he say that holding his beliefs was harmful because he genuinely believed that he had not caused harm to anyone.

183.    On Thursday, December 9, Dr. Fox saw on the calendar that Chief Baker had set up a meeting for the following week with the two other Fire Department chaplains and a chaplain from the police department. Dr. Fox assumed it was an oversight that he hadn't been invited, but he emailed Vires and let him know that he could make it.

184.    After seeing Dr. Fox's email, Vires called him and told him that it wasn't an oversight. Dr. Fox was being dismissed.

185.    A formal dismissal letter from Chief Baker followed via email the next day, noting that Dr. Fox was being dismissed "to ensure that all of the Department's volunteer chaplains provide a comforting and welcoming presence and service for any and all firefighters and Department employees."

186.    Dr. Fox was shocked at the accusation that he did not provide comfort and care to Fire Department members.

187.    On information and belief, Chief Baker alone made the decision to terminate Dr. Fox from his position.

188.    Alternatively, the City Manager and/or City Council ratified, acquiesced, and sanctioned Chief Baker's decision to terminate Dr. Fox.

189.    Adding insult to injury, Dr. Fox wasn't allowed to keep his Fire Department badge and uniform.

190.    Generally, when a person retires from the Fire Department, he keeps his uniform. And he might wear the uniform in retirement, for example, if he attends a 9/11 memorial.

191.    On December 17, Vires went to Dr. Fox's house to retrieve his Fire Department items and uniform. Dr. Fox had everything ready for Vires on the porch.

192.    Because Dr. Fox was deprived of his chaplain uniform, his ministry was also affected.

193.    After all, he could no longer officiate in uniform a wedding of a couple that wanted to honor their firefighter relatives.

194.    In response to his termination, Dr. Fox also wrote a letter to the Department, which he sent to Vires.

195.    Dr. Fox sought to vindicate his reputation. He explained his commitment to the Department, the integrity he had demonstrated as a chaplain, and the course of events that led to his termination.

196.    After receiving Dr. Fox's letter, the Department did not rescind his termination, nor did it allow Dr. Fox a more honorable parting, nor is Dr. Fox aware of the Department sharing his letter with firefighters to explain his side of the story.

197.    The net result of the Fire Department's actions was to punish Dr. Fox for his own personal speech—unrelated to his job duties—on religious views held by tens of millions of orthodox Christians.

198.    Neither Dr. Fox's speech nor his religious views interfered with his ability to provide high quality chaplaincy services to the Fire Department, nor did they cause any legitimate disruption.

199.    Indeed, between the time Dr. Fox posted his blog entries and his termination, he continued to provide the same compassionate, caring, and exemplary service he had provided for the past eight years.

200.    Even on the day of his termination, Dr. Fox demonstrated his commitment to the Department and Chaplains' Program, proactively communicating about a chaplain meeting.

201.    Other than at the official meetings called by Assistant Chief Vires and Chief Baker, not once did Dr. Fox's blog posts, his protected speech, or his religious

views about the immutability of biological sex come up when he was carrying out his duties for the Fire Department.

202.    Firefighters continued to seek Dr. Fox's services and counsel the same as they always had.

203.    Outside of official meetings about the blog posts with Assistant Chief Vires and Chief Baker, Dr. Fox's service to the Fire Department continued up to the day of his termination without disruption, interference, or any adverse effects on Dr. Fox or the Fire Department.

204.    In short, when anonymous commenters disparaged Dr. Fox's reputation as a compassionate chaplain who had served first responders for over a decade, the City joined in and decided to cancel Dr. Fox despite his exemplary service.

<u>Evolving social and political discourse</u>

205.    Dr. Fox's views for which he was unceremoniously dismissed are well within the mainstream of political discourse.

206.    States are grappling with how to approach fairness in athletics, particularly as it relates to male participation in women's sports.

207.    Opinions vary about who should be allowed to compete in women's sports. But since 2020, state legislatures have been moving toward requiring schools to not allow biological males who identify as transgender to participate in women's sports.

208.    In October 2021, the Texas Legislature passed, and the Governor signed, a bill requiring public schools to separate athletic participation based on biological sex. H.B. 25, 87th Leg., 3d Called Sess., ch. 2 (Tex. 2021) (codified at Tex. Educ. Code § 33.0834).

209.    Between 2020 and 2021, nine states besides Texas enacted similar bills to protect women's sports. And in 2022, more than a dozen other states have introduced or passed similar bills.[8]

210.    At the same time, sports organizations throughout the world are wrestling with their own policies about male participation in women's sports.

211.    In November 2021, the International Olympic Committee ("IOC") enacted a new framework in which it defers to the policy of the governing bodies of the various sports.[9]

212.    Following the IOC's lead, FINA (Fédération Internationale de Natation), the international body governing swimming, enacted a new policy in June 2022, preventing male-to-female transgender athletes from competing in the women's category unless they can show they never experienced male puberty.[10]

213.    Also in June 2022, the International Rugby League halted all participation of male-to-female players in the women's category.[11]

214.    In other words, Dr. Fox provided commentary on an extremely timely cultural issue on his blog.

215.    And Dr. Fox's views on males in women's sports are in line with what many states and organizations are doing, including Texas.

---

[8] *U.S. State Legislation*, Save Women's Sports, https://savewomenssports.com/state-legislation (last visited Aug. 4, 2022).
[9] *IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations*, International Olympic Committee (2021), https://stillmed.olympics.com/media/Documents/News/2021/11/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf.
[10] *Policy on Eligibility for Men's and Women's Competition Categories*, Fédération Internationale de Natation (June 6, 2022), https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf
[11] *Statement on Transgender Participation in Women's International Rugby League*, International Rugby League (June 21, 2022), https://www.intrl.sport/news/statement-on-transgender-participation-in-women-s-international-rugby-league.

<u>The Fire Department chaplaincy today</u>

216.    Since Dr. Fox's dismissal in December 2021, the Chaplains' Program has suffered for lack of leadership.

217.    Only two fire chaplains remain, and their involvement with the Department has dwindled.

218.    Defendants' decision to cancel Dr. Fox continues to have negative repercussions for Dr. Fox and for others.

219.    For instance, in July 2022, Dr. Fox received a call from a nearby fire department in Texas—the Lake Travis Fire Department—asking him to come out to the site of a drowning and offer a prayer.

220.    The Lake Travis Fire Department did not know that Dr. Fox was no longer Lead Chaplain for the Fire Department.

221.    Dr. Fox told the Lake Travis Fire Department that while he would gladly come in his own clothes as a private citizen to pray, he could not come as an official chaplain.

222.    The Lake Travis Fire Department told Dr. Fox that while they wished Dr. Fox could come to the scene, it would break protocol to have Dr. Fox come in his private capacity.

<u>Austin's policymaking and agenda</u>

223.    The Austin City Manager selects, and the Austin City Council confirms, the Fire Chief of the Department.

224.    On November 2, 2018, Austin City Manager Spencer Cronk announced that he had selected Chief Baker to be the next Fire Chief for the City.

225.    On November 15, the City Council voted to confirm Chief Baker.

226.    The City's Personnel Policies for non-civil service personnel defines the Department Director as the "person appointed by and responsible to the City Manager or City Council for the administration of a Department."

227.    The Fire Chief is the Department Director for the Fire Department.

228.    Under the City's Personnel Policies, the Department Director is responsible to select new employees.

229.    The Fire Chief also makes the final decisions and policies for the City about hiring and firing volunteer fire chaplains.

230.    The Fire Chief authorizes all General Orders applicable to the Fire Department.

231.    The Fire Chief is also the City's final policymaker on discrimination and harassment within the Fire Department, including authorizing the definitions of those behaviors and the consequences for engaging in them.

232.    The Fire Chief also decides whether to approve the policies in the Chaplain Manual.

233.    While punishing Dr. Fox for expressing his own views on his own time, the City permits and even celebrates speech promoting its own social-justice agenda.

234.    The City celebrates "Pride Month" every June, and the Department does as well, touting that it was the first public safety agency in Austin to participate in the Pride Parade.

235.    In October 2019, the Fire Department released a public safety message featuring a drag queen.[12]

236.    In summer 2021, the Fire Department had its crews wear shirts emblazoned with a rainbow during the month of June for Pride Month.

---

[12] *New Austin Fire Department PSA features local drag queen*, KVUE (Oct. 11, 2019, 5:20 PM), https://www.kvue.com/video/news/local/austin-fire-department-psa-drag-queen/269-d6384553-48e0-4ff4-9073-4fdbe591924b.

237.    On information and belief, in June 2022, some AFD members were required to wear the same or similar shirts emblazoned with a rainbow for Pride Month.

238.    In June 2022, local ABC news outlet KVUE chose Fire Specialist Chafino to be a spokesperson for its "Celebrating Pride" event. The Fire Department enthusiastically shared the story on Twitter.

239.    But upon information and belief, under the guise of anti-discrimination, the Fire Department maintains a policy, custom, or practice of punishing speech that it perceives as critical of its social-justice agenda.

240.    Dr. Fox respects the government's ability to speak for itself. And he supports the rights of citizens and businesses to express their views about marriage and gender. He merely wishes to enjoy that same freedom.

241.    The Fire Department chose to deny Dr. Fox that freedom and to punish him for expressing his religious, cultural, and political viewpoint on his own time, wholly apart from his chaplain duties.

<u>First Cause of Action</u>
<u>First Amendment Retaliation</u>

242.    Dr. Fox repeats and realleges each allegation contained in paragraphs 1 to 241 of this complaint.

243.    The First Amendment's Free Speech and Free Press Clause protects Dr. Fox's ability to speak; to create, publish, sell, and distribute speech; to associate with others for expressive purposes; and to associate with messages of Dr. Fox's choosing.

244.    The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

245.    In addition to providing a valuable service to his community, Dr. Fox received a valuable government benefit from holding his Lead Chaplain position.

246.    Dr. Fox speaks as a private citizen when he writes on his blog DrAndrewFox.com and promotes his blog on his personal social media accounts.

247.    Dr. Fox's interest as a citizen commenting on matters of public concern outweighs the City's interest in efficient provision of services.

248.    Dr. Fox's speech on matters of public concern never prevented Defendants from efficiently providing services to the public.

249.    Defendants' retaliatory and unconstitutional actions taken against Dr. Fox would deter a person of ordinary firmness from exercising his right to free speech in the future.

250.    Defendants took these retaliatory and unconstitutional actions against Dr. Fox at least in part because of the views he had expressed on matters of public concern.

251.    The decisions taken by Defendants via the final policymaker and based on Department policy were the moving force of the violation of Dr. Fox's rights.

252.    Defendants' retaliatory and unconstitutional actions taken against Dr. Fox violate his clearly established rights of the freedom of speech and the freedom of the press as guaranteed by the First Amendment to the United States Constitution.

<u>Second Cause of Action</u>
<u>First Amendment: Viewpoint Discrimination and Compelled Speech</u>

253.    Dr. Fox repeats and realleges each allegation contained in paragraphs 1 to 241 of this complaint.

254.    The First Amendment's Free Speech and Free Press Clause protects Dr. Fox's ability to speak; to create, publish, sell, and distribute speech; to associate with others for expressive purposes; and to associate with messages of Dr. Fox's choosing.

28

255.    The First Amendment also protects Dr. Fox's ability not to speak; to exercise editorial control over his speech; to operate his personal blog and express his own views; and to decline to create or write speech.

256.    The First Amendment also protects Dr. Fox's right to be free from viewpoint-based discrimination.

257.    The First Amendment also protects against the government's imposing retribution based on what a citizen chooses to think, say, or publish.

258.    Dr. Fox exercised his rights to free speech, free press, and free association when he wrote, published, and associated with his series of blog posts about social justice, gender, and women's sports on his personal blog at DrAndrewFox.com.

259.    Defendants sought to compel Dr. Fox to recant his views and to communicate that he caused alleged harm to the LGBT community when he believes the opposite. Dr. Fox deeply cares for everyone, including members of that community, and at no point did he harm members of that community.

260.    By punishing Dr. Fox for refusing to recant his views on male participation in women's sports, Defendants attempted to compel Dr. Fox's speech in violation of his rights under the First Amendment.

261.    Defendants engaged in viewpoint discrimination by punishing Dr. Fox for his views relating to gender identity while cheering AFD and its members for holding opposite views.

262.    Defendants terminated Dr. Fox as Lead Chaplain specifically to suppress his religious and political beliefs, including about males in women's sports.

263.    Defendants' action thus violates Dr. Fox's clearly established rights to free speech, free press, and free association.

Third Cause of Action
First Amendment: Free Exercise of Religion

264.    Dr. Fox repeats and realleges each allegation contained in paragraphs 1 to 241 of this complaint.

265.    The First Amendment's Free Exercise Clause protects Dr. Fox's right to own and operate his blog and nonprofit organization, to create or not create expression, to participate or not participate in religious exercises, to speak or to not speak, and to associate or not associate in accordance with his religious beliefs.

266.    The First Amendment also protects Dr. Fox from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to policies and practices that lack neutrality and general application, being targeted for his religious beliefs, and being punished for exercising his religious beliefs.

267.    The First Amendment doubly protects religious speech under the hybrid rights doctrine—the free exercise of religion in conjunction with other rights, namely the right to free speech.

268.    Dr. Fox exercises his religion under the First Amendment when he follows God's calling on his life; professes his faith in writings, lectures, and sermons; operates his nonprofit organization consistent with his religious beliefs; writes blog posts and social media posts consistent with his religious beliefs; and exercises his editorial judgment consistent with his religious beliefs.

269.    Dr. Fox also exercises his religion when he refuses to express a message that violates his religious beliefs.

270.    Dr. Fox's sincerely held religious beliefs motivated him to share biblical thoughts about culture and gender on his personal blog.

271.    Dr. Fox's sincerely held religious beliefs motivated him to write his three blog posts in the Willy Woke series.

272.    Dr. Fox's sincerely held religious beliefs prevented him from deleting his posts, recanting his viewpoints, or apologizing for alleged amorphous harm that he did not believe he caused.

273.    Defendants substantially burdened Dr. Fox's religious exercise when they forced Dr. Fox to choose between exercising his religious beliefs and being dismissed or violating his conscience.

274.    The termination decision also infringed on the hybrid of Dr. Fox's Free Exercise of Religion and Free Speech rights.

275.    Requiring Dr. Fox to recant and write an apology letter and ultimately terminating Dr. Fox were official expressions of hostility toward Dr. Fox's religious viewpoints.

276.    Defendants dismissed Dr. Fox to suppress the religious exercise of Dr. Fox and similarly situated volunteers and employees.

277.    The decision to terminate Dr. Fox was not neutral or generally applicable because the City openly promotes viewpoints contrary to Dr. Fox's, decides on an ad hoc basis what may cause offense, and because the decision was based on religious animus.

278.    Defendants cannot offer a compelling or even valid interest in a narrowly tailored way for infringing Dr. Fox's right to freely exercise his religion.

279.    Accordingly, Defendants violated Dr. Fox's clearly established First Amendment right to freely exercise religion.

Fourth Cause of Action
Violation of Texas Constitution Article 1, Section 6

280.    Dr. Fox repeats and realleges each allegation contained in paragraphs 1 to 241 of this complaint.

281.    Article 1, Section 6 of the Texas Constitution protects Dr. Fox's right to own and operate his blog and nonprofit organization, to create or not create

expression, to participate or not participate in religious exercises, to speak or not speak, and to associate or not associate in accordance with his own conscience in matters of religion.

282.    Article 1, Section 6 of the Texas Constitution also protects Dr. Fox from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to policies and practices that lack neutrality and general application, being targeted for his religious beliefs, and being punished for exercising his religious beliefs.

283.    Dr. Fox exercises his religion under Article 1, Section 6 of the Texas Constitution when he follows God's calling on his life; professes his faith in writings, lectures, and sermons; operates his business consistent with his religious beliefs; writes blog posts and social media posts consistent with his religious beliefs; and exercises his editorial judgment consistent with his religious beliefs.

284.    Dr. Fox also exercises his religion when he refuses to express a message that violates his religious beliefs.

285.    Dr. Fox's sincerely held religious beliefs motivated him to share biblical views about culture and gender on his personal blog.

286.    Dr. Fox's sincerely held religious beliefs prevented him from deleting his posts, recanting his viewpoints, or apologizing for alleged amorphous harm that he did not believe he caused.

287.    Defendants, as human and governmental authorities, interfered with and attempted to control Dr. Fox's rights of conscience when they pressured Dr. Fox to recant his views and, when he would not, terminated him.

288.    Defendants also substantially burdened Dr. Fox's religious exercise when they forced Dr. Fox to choose between exercising his religious beliefs and being dismissed or violating his conscience.

289.    Requiring Dr. Fox to recant and write an apology letter and ultimately terminating Dr. Fox were official expressions of hostility toward Dr. Fox's religious viewpoints.

290.    Defendants dismissed Dr. Fox to suppress the religious exercise of Dr. Fox and similarly situated volunteers and employees.

291.    The decision to terminate Dr. Fox was not neutral or generally applicable because the City openly promotes viewpoints contrary to Dr. Fox's and decides on an ad hoc and individualized basis which (private) speech may offend someone.

292.    Defendants cannot offer a compelling or even valid interest in a narrowly tailored way for infringing Dr. Fox's right to freely exercise his religion under the Texas Constitution.

293.    Accordingly, Defendants violated Dr. Fox's right to follow his conscience and exercise his religion under Article 1, Section 6 of the Texas Constitution.

294.    Dr. Fox is entitled to injunctive relief, including but not limited to reinstatement, to remedy the violations of the Texas Constitution.

<u>Fifth Cause of Action</u>
<u>Violation of Texas Constitution Article 1, Section 8</u>

295.    Dr. Fox repeats and realleges each allegation contained in paragraphs 1 to 241 of this complaint.

296.    Article 1, Section 8 of the Texas Constitution protects Dr. Fox's ability to speak; to create, publish, sell, and distribute speech about his opinions on any subject; to associate with others for expressive purposes; and to associate with messages of Dr. Fox's choosing.

297.    Article 1, Section 8 of the Texas Constitution also protects Dr. Fox's ability not to speak; to exercise editorial control over his speech; to operate his

personal blog and express his opinions on any subject; and to decline to create or write speech.

298.    Article 1, Section 8 of the Texas Constitution protects against the government's imposing retribution based on what a citizen chooses to think, speak, write, or publish.

299.    Dr. Fox exercised his rights to free speech and free press when he published his series of blog posts about social justice, gender, and women's sports on his personal blog at DrAndrewFox.com.

300.    Defendants sought to compel Dr. Fox to recant his views and to communicate that he caused alleged harm to the LGBT community when he believes the opposite. Dr. Fox deeply cares for everyone, including members of that community, and at no point did he harm members of that community.

301.    By punishing Dr. Fox for refusing to recant his views on male participation in women's sports, the City attempted to compel Dr. Fox's speech in violation of his rights under Article 1, Section 8 of the Texas Constitution.

302.    Defendants' decision to terminate Dr. Fox's rights to free speech and free press under the Article 1, Section 8 of the Texas Constitution.

303.    Defendants terminated Dr. Fox as Lead Chaplain specifically to suppress his religious and political beliefs, including about males in women's sports.

304.    Defendants' action thus violates Dr. Fox's rights to free speech and free press.

305.    Dr. Fox is entitled to injunctive relief, including but not limited to reinstatement, to remedy the violations of the Texas Constitution.

## Prayer for Relief

Plaintiff respectfully requests that this Court enter judgment against Defendant and provide him with the following relief:

(A)     A permanent injunction requiring Defendants, its agents, employees, and all persons in active concert or participation with it to:

    1.  reinstate Dr. Fox to his former position as Lead Chaplain of the Austin Fire Department; and

    2.  stop enforcing its policies and practice of taking adverse actions against Dr. Fox and other City personnel for expressing constitutionally protected messages of private citizens about matters of public concern related to gender-identity and women's sports;

(B)     A declaration that that Defendants violated Dr. Fox's rights to free speech, free association, free exercise, and freedom from religious hostility, as applied to Dr. Fox's constitutionally protected activities;

(C)     Compensatory damages, including, but not limited to damages for the humiliation, emotional distress, inconvenience, and loss of reputation caused by Defendants' actions and statements, lost revenue and lost profits;

(D)     Nominal damages for violating Dr. Fox's federal constitutional rights;

(E)     Reasonable attorneys' fees, costs, expenses in accordance with 42 U.S.C. § 1988;

(F)     That this Court issue the requested injunctive relief without a condition of bond or other security required of Dr. Fox; and

(G)     Prejudgment interest on any pecuniary awards provided;

(H)     All other relief that this Court deems just and equitable.

Respectfully submitted this 18th day of August 2022.

Ryan L. Bangert
Texas Bar No. 24045446
Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*±
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
rbangert@ADFlegal.org
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Kelly E. Howard*
Virginia Bar No. 94724
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(480) 707-4790 Fax
khoward@ADFlegal.org

By: s/ Hillary K. Lynch
Hillary K. Lynch
Texas Bar No. 24055800
**Platt Cheema Richmond PLLC**
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
(214) 559-2700
(214) 559-4390 Fax
hlynch@pcrfirm.com

*Attorneys for Plaintiff*

*Pending Admission *Pro Hac Vice*

±Designated as Lead Counsel